ISAIAH BROWN,                           *
                                        *
        Plaintiff,                      *
                                        *
        v.                              *           CV 214-052
                                        *
WINN-DIXIE STORES, INC. and             *
BI-LO HOLDINGS, LLC,                    *
                                        *
        Defendants.                     *
                                   _____

                        **O R D E R**
                   _____

In this action, Plaintiff Isaiah Brown alleges that during his employment with Defendant Winn-Dixie Stores, Inc. ("Winn-Dixie") and Bi-Lo Holdings, LLC ("Bi-Lo") (collectively, "Defendants"), Defendants interfered with his rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, when they refused to provide him time off to attend physical therapy appointments following a December 2012 car accident that occurred while he was on his way to pick up produce from another Winn-Dixie store. Mr. Brown further claims that Defendants failed to pay him for all hours worked and for overtime compensation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Finally, Mr. Brown alleges Defendants retaliated against him for (1) taking leave to recuperate from his back injury in violation of the FMLA and (2) complaining about not being paid for his overtime hours in violation of the FLSA when they terminated his employment on

December 4, 2013. Presently before the Court is Defendants'
Motion for Summary Judgment based on the doctrine of judicial
estoppel. (Doc. 27.) For the reasons that follow, the Court
**GRANTS** the motion **IN PART**.

## I. BACKGROUND

### A. Mr. Brown's Employment History

Mr. Brown began working for Winn-Dixie in 1987 when he was
sixteen-years-old and rose to the position of Produce and Floral
Manager at Winn-Dixie Store 60 before his termination on
December 4, 2013. (Pl.'s Dep., Doc. 29-1, at 54-55, 111, 206,
358.) According to Mr. Brown, when he worked at Winn-Dixie
Store 159 between approximately late 2008 and late 2010,
management regularly required him to "work off the clock in
order to get [the] job done" and he was not paid for doing so.
(Id. at 162-65.) "[S]ometime before late 2010," Mr. Brown also
performed "produce resets" at eighteen other Winn-Dixie stores,
but Defendants never paid him for that work either. (Id. at 91-
98.) For each reset, Mr. Brown would work between eight and
fifteen hours, and such time amounted to "thousands of dollars"
in unpaid wages. (Id. at 91, 94.) Beginning in late 2010 while
working at Winn-Dixie Store 60, at least once a week management
directed him to work off the clock "until the job was finished"
and would threaten him with termination if he refused. (Id. at
236-37, 241.) Managers, in fact, would alter Mr. Brown's time

2

records if he stayed clocked in longer than permitted. (Id. at 241-44.) Mr. Brown testified that he knew his rights were violated *at the time* Defendants failed to pay him for the above-described activities and extended hours (id. at 245-46), and he finally called human resources in November 2013 to complain about his managers' alteration of his time records (id. at 243-45).

On December 7, 2012, Mr. Brown was hit from behind when stopped at a red light while on his way to pick up produce from Winn-Dixie Store 159 to supplement certain stock at Store 60. (Id. at 157; Pl.'s Aff., Doc. 37, Ex. A. ¶¶ 4-6.) The force of the accident broke the seat occupied by Mr. Brown, and he suffered injuries to his neck and back. (Pl.'s Dep. at 31, 157-58; Pl.'s Aff. ¶ 7; Adams Aff., Doc. 37, Ex. C, ¶ 10.) Mr. Brown testified that "the night [he] got in the car accident [he] had to go straight back to work. [He] couldn't go to the hospital because [he] had to work . . . [a]nd [he] was told by [the] store manager that if [he] sees any doctors' excuses or anything that [Mr. Brown] probably wasn't going to have a position." (Pl.'s Dep. at 32-35.) The manager "said, as of right now, there's nobody to replace [you]." (Id. at 35.) "So if [you] take leave," you are "not going to have a position when [you] get back." (Id.; see also Pl.'s Aff. ¶ 10.) Mr. Brown believed *at the time* of this interaction that his rights had been violated. (Pl.'s Dep. at 35.) Instead of calling human

3

resources, however, Mr. Brown reached out to other produce managers to see if they had anyone under their supervision who could fill in so that he could take medical leave. (Id. at 36; Doc. 37, Ex. B.)

Mr. Brown did not obtain leave until late August 2013 (Pl.'s Dep. at 67, 283), at which point Defendants cleared him to be out until October 28, 2013 (id. at 67; see also id., Ex. 13 at 3). Between the accident and that time, Mr. Brown had to reschedule numerous medical appointments — for which his insurance was charged a fee — because Defendants would not allow him to take time off. (Pl.'s Dep. at 196-98.) While on leave, Mr. Brown's manager told him that if he came back early, he could keep all of his doctor's appointments. (Id. at 193-94, 283.) Mr. Brown agreed and returned to work on October 23, 2013, five days ahead of schedule. (Id. at 281, 283.) Subsequent to Mr. Brown's return, however, he missed four scheduled appointments for physical therapy because his manager did not allow him to take time off despite his earlier promise. (Id. at 321-22.)

Immediately before and after Mr. Brown's FMLA leave, he received a series of performance counselings and warnings for violations of Winn-Dixie policies. (Id. at 263-69; id. Ex. 7 (including incidents on August 1, 9, and 13; November 14, 18, and 24; and December 1, 2013).) Defendants formally terminated Mr. Brown on December 4, 2013. (Id. at 109-112, 303-05.) Mr.

4

Brown repeatedly testified that the manager said he was fired on November 18, 2013, "but they didn't have time to actually tell me I was fired" until over two weeks later. (Id.) Indeed, he claims the dismissal sheet given to him was dated November 18, 2013. (Id.)

**B.    Bankruptcy Proceeding**

On February 25, 2009, while employed by Defendants, Mr. Brown voluntarily filed a Chapter 13 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Georgia through his counsel, Richard Taylor. (Bankr. Doc. 1.) Mr. Brown previously filed a Chapter 13 petition in approximately 1994. (Pl.'s Dep. at 331.) On his Schedule B of personal assets in the 2009 petition, Mr. Brown indicated that he had no "contingent or unliquidated claims." (Bankr. Doc. 1 at 10.) He further represented that he had no "interests in IRA, ERISA, Keogh, or other pension or profit sharing plans." (Id.) Lastly, Mr. Brown indicated that he had no "[o]ther personal property of any kind not already listed." (Id. at 11.) On his Statement of Financial Affairs, Mr. Brown listed only the wages earned from Winn-Dixie as gross income. (Id. at 25.) In response to the question about Mr. Brown's participation in lawsuits and administrative proceedings within the year immediately prior to filing his petition, Mr. Brown listed only a garnishment collection action. (Id. at 26.) Mr. Brown made

these representations under penalty of perjury. (Id. at 24, 32.)

Under the proposed Chapter 13 plan, Mr. Brown paid $53.00 per month for a period of 60 months, to be distributed by the trustee *to his attorney* after payment of the expenses of administration. (Bankr. Doc. 2.) On May 5, 2009, the Bankruptcy Court confirmed the plan. (Bankr. Doc. 32; see also Bankr. Doc. 35.) On February 3, 2014, the trustee notified Mr. Brown that the final disbursements had been made according to the plan and his wages would no longer be withheld. (Bankr. Doc. 60.) On March 18, 2014, the Bankruptcy Court granted Mr. Brown a complete discharge under 11 U.S.C. § 1328(a). (Bankr. Doc. 63.) According to the Chapter 13 Trustee's Final Report and Account, nine unsecured creditors asserted $15,932.72 in allowable claims, but only $176.83 — a mere 1.1 percent — was distributed to them.[1] (Bankr. Doc. 65 at 3.) On May 21, 2014, the Bankruptcy Court entered a final decree and closed the proceeding. (Bankr. Doc. 66.)

The bankruptcy docket reflects that Mr. Taylor represented Mr. Brown throughout the entirety of his bankruptcy proceeding. On December 17, 2013, Mr. Taylor contacted the Chapter 13 Trustee to request Mr. Brown's payoff amount, as Mr. Brown "lost his job and wishe[d] to pay the remaining payments with his 401K

---

[1]    The Chapter 13 Trustee's Final Report and Account also indicates that $18,223.89 of unsecured claims were discharged without payment, but the Court could not reconcile this figure with the $15,932.72 total presented on page three of the same report. (See Bankr. Doc. 65 at 1.)

as soon as possible." (Doc. 31-5.) Immediately after his termination, Mr. Brown retained Rita Spalding to pursue the instant case. (Pl.'s Dep. at 328.) On December 19, 2013, Ms. Spalding sent a letter to Mr. Brown's manager at Winn-Dixie and to the General Counsel for Bi-Lo. (Doc. 29-5.) The letter stated that "[w]e contend that Mr. Brown was terminated in violation of the Family Medical Leave Act. Mr. Brown also has a claim for unpaid overtime compensation under the Fair Labor Standards Act, and possibly under the Georgia Whistleblower's Act. . . . The purpose of this letter is to notify you of Mr. Brown's claims." (Id.) It further warned that Ms. Spalding was "currently drafting a Complaint to file on Mr. Brown's claims." (Id.) When Mr. Brown ultimately filed this suit on April 14, 2014, he did not amend his bankruptcy schedules or otherwise inform the bankruptcy court of his FLSA and FMLA claims against Defendants. (Pl.'s Dep. at 347-48, 353.)

On January 23, 2015, Defendants sent Ms. Spalding a comprehensive memorandum (1) arguing that Mr. Brown's FLSA and FMLA claims are barred by judicial estoppel; (2) warning her that it would file a motion for summary judgment and explore sanctions; and (3) urging her to voluntarily dismiss the suit. (Doc. 26-1.) Ten days later, on February 2, 2015, Mr. Brown moved to reopen his Chapter 13 case. (Bankr. Doc. 67.) The Bankruptcy Court granted that motion on February 4, 2015.

(Bankr. Doc. 68.) On February 5, 2015, Mr. Brown filed amended schedules to add the following:

1. the instant lawsuit against Defendants with an estimated value of $200,000;

2. a personal injury lawsuit related to the car accident at an estimated value of $100,000;

3. a 401(k) account with an estimated value of $43,000;

4. a hardship withdrawal from that account in 2011 in the amount of $4,900; and

5. income earned as a personal chef.

(Bankr. Doc. 69.) With the addition of these assets, all of which existed during the pendency of his bankruptcy, Mr. Brown now values his assets as worth over $349,000 as compared to the $1,450 initially identified in his 2009 petition. (See id. at 4; Bankr. Doc. 1 at 6.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437

8

(11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex, 477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact

that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave Mr. Brown notice of Defendants' motion for summary judgment and informed him of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 28.) The notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), therefore, are satisfied and the motion is ripe for review.

## III. DISCUSSION

Defendants argue that Mr. Brown's claims are barred by the doctrine of judicial estoppel because he failed to disclose them to the Bankruptcy Court while his Chapter 13 case was ongoing. Mr. Brown counters that (1) he had no duty to disclose his claims and (2) there is no evidence that he intentionally took an inconsistent position under oath or otherwise intended to manipulate the judicial system. The Court addresses each of these arguments in turn.

### A.    Judicial Estoppel

"Judicial estoppel is an equitable doctrine invoked at a court's discretion." Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1285 (11th Cir. 2002). Under this doctrine, a party is precluded from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding. Id. "The purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." Id. (quotation omitted). For this reason, parties asserting judicial estoppel need not demonstrate individual prejudice. Id. at 1286. Instead, as the Eleventh Circuit Court of Appeals recently set forth in D'Antignac v. Deere & Co:

> The Supreme Court has enumerated three non-exclusive considerations that may inform a court's decision of whether to apply judicial estoppel: (1) whether the present position is "clearly inconsistent" with the

11

earlier position; (2) whether another tribunal accepted the earlier position; and (3) whether the party advancing the inconsistent position would derive an unfair advantage. We have added two other considerations to the list (1) whether "the allegedly inconsistent positions were made under oath in a prior proceeding"; and (2) whether the inconsistences were "calculated to make a mockery of the judicial system." These two factors are not "inflexible or exhaustive; rather, courts must always give due consideration to all the circumstances of a particular case."

No. 14-10048, 2015 WL 1321570, at *2 (11th Cir. Mar. 25, 2015) (per curiam) (internal citations omitted).

The Court now addresses (1) whether Mr. Brown took inconsistent positions under oath, and (2) whether he intended to make a mockery of the judicial system, as well as (3) additional factors that guide the Court's analysis of whether the application of judicial estoppel is appropriate in this case.

### 1. *Inconsistent Positions Under Oath*

Mr. Brown took inconsistent positions under oath only if he had a continuing duty to disclose changes in his asset schedules. Robinson v. Tyson Foods, Inc., 595 F.3d 1269, 1274 (11th Cir. 2010). Mr. Brown contends that as a Chapter 13 debtor pursuing claims under the FLSA and FMLA — as opposed to a claim of employment discrimination — he did not have a continuing duty to disclose his assets to the Bankruptcy Court. (See, e.g., Pl.'s Sur-Reply, Doc. 37, at 15.) The Court disagrees.

12

"A debtor seeking shelter under the bankruptcy laws must disclose all assets, *or potential assets*, to the bankruptcy court." Burnes, 291 F.3d at 1286 (emphasis added) (citing 11 U.S.C. §§ 521(1), 541(a)(7)). "Full and honest disclosure in a bankruptcy case is crucial to the effective functioning of the federal bankruptcy system." Id. (internal quotations omitted). Importantly, "[t]he duty to disclose is a continuing one that does not end once the forms are submitted to the bankruptcy court; rather, a debtor must amend his financial statements if circumstances change." Id. This statutory duty to disclose applies in both Chapter 7 and Chapter 13 proceedings. Robinson, 595 F.3d at 1274.

Mr. Brown argues that Muse v. Accord Human Res., Inc., 129 F. App'x 487 (11th Cir. 2005) (per curiam), controls the outcome of this case. In Muse, the debtor filed a Chapter 13 petition in November 1997 and his plan was confirmed in April 1998. Id. After confirmation, the debtor filed suit against the defendants under the FLSA to recover unpaid overtime wages incurred between January 2000 and September 2002. Id. at 487-88. As a result, the debtor's wage claim arose both post-petition and post-confirmation. After the defendants argued that the debtor was judicially estopped from asserting the wage claim because he had failed to amend and list it in his bankruptcy schedules, the district court granted their motion for summary judgment. Id. at 488. The Eleventh Circuit reversed. Id. at 490. Based on

its analysis of Telfair v. First Union Mortg. Corp.,[2] in which the court addressed the interplay between 11 U.S.C. §§ 1306(a) and 1327(b), and two decisions of the bankruptcy courts,[3] the court held that because the debtor's unpaid wage claim accrued post-confirmation *and* "there [was] no assertion that it was necessary for the plan," the wage claim was not property of the debtor's estate, he had no duty to disclose it, and he was not judicially estopped from bringing an action to recover damages. Id. at 488-90 (emphasis added).

The Eleventh Circuit Court of Appeals revisited the interplay between 11 U.S.C. §§ 1306(a) and 1327(b) three years after Muse, however, in In re Waldron, 536 F.3d 1239, 1241-43 (11th Cir. 2008). Importantly, the Waldron court distinguished Telfair as addressing only that property of which the debtor is aware *at the time of petition* and not "new assets" that a debtor acquires after confirmation. See id. at 1241-43. Thus, departing from its rule in Muse, Waldron explicitly held that a debtor's claims for legal relief *of all types* that arise after the confirmation of a Chapter 13 plan but before the completion of the plan are property of the bankruptcy estate. See id. 1241-43, 1245; see also Robinson, 595 F.3d at 1274 ("It is undisputed that a pending lawsuit seeking monetary compensation qualifies as an asset. It is also undisputed that such an asset

---

[2]    216 F.3d 1333 (11th Cir. 2000).

[3]    In re Carter, 258 B.R. 526, 527 (Bankr. S.D. Ga. 2001); In re Ross, 278 B.R. 269, 274-75 (Bankr. M D. Ga. 2001).

qualifies as property of the bankruptcy estate.")(internal citations omitted). Accordingly, the court found that the bankruptcy court did not abuse its discretion when it required the plaintiffs to amend their schedule of assets to disclose the settlement of a claim for uninsured motorist benefits that arose after confirmation. _Waldron_, 536 F.3d at 1244. In doing so, the court reaffirmed Eleventh Circuit precedent "recognizing a debtor's _continuing_ _duty_ to disclose changes in his financial situation during the pendency of his bankruptcy." _Id._ (citing _Burnes_, 291 F.3d at 1286) (emphasis added).

Although _Muse_ is factually identical to the instant case for all intents and purposes, it is unpublished and therefore not controlling authority. _See_ _Bonilla_ _v._ _Baker_ _Concrete_ _Const., Inc._, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007). It may be persuasive only insofar as its legal analysis warrants. _See_ _id._ The Court finds _Muse_ warrants little weight given the Eleventh Circuit's pronounced shift in _Waldron_ on the nature of post-confirmation assets and subsequent holdings reaffirming debtors' continuing statutory duty to amend. _See,_ _e.g.,_ _D'Antignac_, 2015 WL 1321570, at *2; _Robinson_, 595 F.3d at 1274-75; _see_ _also_ _Smith_ _v._ _Werner_ _Enterprises,_ _Inc._, No. 14-0107-WS-B, 2014 WL 6977889, at *2 (S.D. Ala. Nov. 21, 2014)(analyzing the application of judicial estoppel to an FLSA claim).

Mr. Brown attempts to distinguish _Waldron_ by pointing out that the issue of judicial estoppel was not before the court and

15

the *Waldron* plaintiffs received the proceeds of their insurance settlement *while the bankruptcy was still pending*. (Pl.'s Resp., Doc. 31-1, at 16.)  Moreover, as in *D'Antignac*, Mr. Brown latches on to the following *Waldron* quote: "We do not hold that a debtor has a free-standing duty to disclose the acquisition of any property interest after the confirmation of his plan under Chapter 13.  Neither the Bankruptcy Code nor the Bankruptcy Rules mention such a duty."  (Pl.'s Resp. at 8-12; Sur-Reply at 16-18 (quoting *Waldron*, 536 F.3d at 1246).)

The Court does not find any of these distinctions to be material.  First, although the issue in *Waldron* was limited to whether a post-confirmation claim for insurance benefits is property of the bankruptcy estate, 536 F.3d at 1241, that inquiry informs precisely what a debtor must disclose, see *Muse*, 129 F. App'x at 489 ("*Because* [the claim] was not part of the bankruptcy estate, Muse had no duty to disclose it.")(emphasis added).  Whether a debtor is required to disclose an asset or claim in turn informs the Court's judicial estoppel analysis. See *Robinson*, 595 F.3d at 1274 ("Robinson took inconsistent positions under oath only if she had a continuing duty to disclose changes in her bankruptcy asset schedule.")  That the phrase "judicial estoppel" does not appear in *Waldron*, therefore, is of no moment.  And despite Mr. Brown's argument that *Waldron* is distinguishable on this ground in his sur-reply brief, he appears to acknowledge elsewhere how crucial the

<u>Waldron</u> inquiry is — he dedicates almost the entirety of his response brief to the very topic of distinguishing between post- and pre-petitions claims when considering the debtor's duty to disclose. (<u>See</u> Pl.'s Resp. at 6-14.)

Second, that Mr. Brown did not have in hand the damages proceeds from the instant suit while his bankruptcy was still pending is irrelevant: "[a] debtor seeking shelter under the bankruptcy laws must disclose all assets, *or potential assets*, to the bankruptcy court." <u>Burnes</u>, 291 F.3d at 1286 (citing 11 U.S.C. §§ 521(1), 541(a)(7)) (emphasis added). The disclosure of such "assets gives the trustee and creditors a meaningful right to request . . . a modification of the debtor's plan to pay his creditors" or, as Defendants emphasize, grant the trustee an opportunity to "to settle the claims and obtain money for the creditors" (Defs.' Br., Doc. 27, at 18). <u>Waldron</u>, 536 F.3d at 1245.

Third, as to the oft-cited <u>Waldron</u> quote identified above, Mr. Brown

> "takes [it] out of context and distorts its meaning. In <u>Waldron</u>, the debtor argue[d] that a duty to disclose assets acquired after confirmation unduly burdens Chapter 13 debtors because they would have to amend their bankruptcy schedules every time they received wages, bought groceries, or filled up a tank of gas. <u>Id.</u> at 1245. In response, the Eleventh Circuit pointed out that "these assets are the kind that are taken into account by the debtor's plan or are consumed after having been purchased with assets vested in the debtor at confirmation." <u>Id.</u> at 1245-46. Thus, the court clarified that there is not a duty to disclose "*any* property interest" acquired

17

post-confirmation, but the "bankruptcy court is entitled to learn about a *substantial asset that the court had not considered* when it confirmed the debtor's plan." Id. (emphasis added).

D'Antignac v. Deere & Co., No. CV 110-116, Doc. 78, at 13 (S.D. Ga. Mar. 13, 2013)(second emphasis added), aff'd, No. 14-10048, 2015 WL 1321570 (11th Cir. Mar. 25, 2015). Legal claims arising post-confirmation, such as a suit for insurance benefits or the filing of EEOC charges, fall into the latter category and must be disclosed to the bankruptcy court. See id.; see also Waldron, 536 F.3d at 1242; Casanova v. Pre Solutions, Inc., 228 F. App'x 837, 841 (11th Cir. 2007). A claim for monetary damages arising out of purported FLSA and FMLA violations presents an even more compelling argument for disclosure given that such an award serves, at least in part, as a form of wage replacement. These wages, as Brown concedes, "were necessary to fulfill the bankruptcy plan." (Pl.'s Sur-Reply at 13.) Cf. Muse, 129 F. App'x at 489 (finding pre-Waldron that the plaintiff's unpaid wage claim was not part of the bankruptcy estate — and therefore did not have to be disclosed — because, in part, "there [was] no assertion that those assets were necessary to meet the terms of the bankruptcy plan").

In sum, Mr. Brown had a duty to disclose his claims to the Bankruptcy Court. The Court thus moves on to address whether Mr. Brown took inconsistent positions under oath in a prior proceeding. On this element, there is little dispute. The

Eleventh Circuit has held that "failure to timely amend a Chapter 13 reorganization plan to reflect a pending claim while simultaneously pursing that claim in another court of law constitutes inconsistent positions under oath." Robinson, 595 F.3d at 1275 (citing Ajaka v. BrooksAmerica Mortg. Corp., 453 F.3d 1339, 1344 (11th Cir. 2006)); see also Burnes, 291 F.3d at 1286. When Mr. Brown "submitted [his] bankruptcy schedules under oath, [he] also submitted that [he] would update those schedules as required." Robinson, 595 F.3d at 1275. Thus, when Mr. Brown filed the instant FLSA and FMLA suit against Defendants, [he] had a "sworn duty to disclose" those claims to the Bankruptcy Court. Id.

Mr. Brown did not amend his schedule of assets or statement of financial affairs forms when he hired Ms. Spalding immediately after his termination on December 4, 2013 to prosecute this action, when he actually filed suit on April 14, 2014, or at any time before the closing of his Chapter 13 proceeding. "By failing to update [his] bankruptcy schedule to reflect [his] pending claim," Mr. Brown "represented that [he] had no legal claims to the bankruptcy court" while simultaneously pursuing his unpaid wage, interference, and retaliation claims in this Court. Robinson, 595 F.3d at 1275. "These two actions, both taken under oath, are clearly inconsistent." Id.

## 2. *Intentional Mockery of the Judicial System*

As Mr. Brown took inconsistent positions under oath, whether judicial estoppel may be applied hinges on the second factor: whether Mr. Brown *intentionally* misled the bankruptcy court. "[T]he doctrine of judicial estoppel applies in situations involving intentional contradictions, not simple error or inadvertence." Burnes, 291 F.3d at 1286. The Eleventh Circuit has often held that deliberate or intentional manipulation of the judicial system can be inferred from the record. Id. at 1287; Robinson, 595 F.3d at 1275. A "debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment." Burnes, 291 F.3d at 1287 (quoting In re Coastal Plains, Inc., 179 F.3d 197, 205 (5th Cir. 1999)). Thus, the requisite intent can be inferred if the debtor "both knew about the undisclosed claims and had a motive to conceal them from the bankruptcy court." De Leon, 321 F.3d at 1291; accord Robinson, 595 F.3d at 1275; Casanova, 228 F. App'x at 840-41; Barger, 348 F.3d at 1295. Where knowledge and motive are present, "intent may be properly inferred from a relatively sparse record." Bennett v. Flagstar Bank, No. 2:10-cv-181, 2011 WL 6152940, at *4 (S.D. Ga. Dec. 8, 2011) (citing Robinson, 595 F.3d at 1275). The relevant inquiry is the debtor's intent "*at the time of nondisclosure.*" Casanova, 228 F. App'x at 841.

The inference of intent drawn from the existence of knowledge and motive, however, is permissive only, not mandatory. Smith, 2014 WL 6977889, at *3 (citations omitted). A trial court's finding of intent may be "overturn[ed]" should the plaintiff "presen[t] sufficient evidence" to take a particular case out of the "general" rule. Robinson, 595 F.3d at 1275-76.

### a. *Knowledge*

Mr. Brown indisputably had knowledge of his FLSA and FLMA claims while his bankruptcy case was pending. Mr. Brown retained an attorney immediately after his discharge on December 4, 2013 to pursue this case. (See Pl.'s Dep. at 328.) His attorney sent Defendants a letter "notifying [them] of representation," identifying his claims, and requesting a litigation hold, as well as Mr. Brown's reinstatement, on December 19, 2013. (Pl.'s Sur-Reply at 7; Doc. 29-4.) He ultimately filed suit on April 14, 2014, which was after his discharge on March 18, 2014 but before the closing of his Chapter 13 case on May 21, 2014. See Burnes, 291 F.3d at 1288 (finding that debtor who filed and pursued employment discrimination claims during pendency of Chapter 13 case clearly had knowledge of the claims).

### b.  *Motive*

"[A] financial motive to secret assets exists under Chapter 13 . . . because the hiding of assets affects the amount to be discounted and repaid."  De Leon, 321 F.3d at 1291; see also Burnes, 291 F.3d at 1288 (finding that Chapter 13 debtor "stood to gain an advantage" by concealing his employment discrimination claims because it was "unlikely he would have received the benefit of a conversion to Chapter 7 followed by a no asset, complete discharge had his creditors, the trustee, or the bankruptcy court known of a lawsuit claiming millions of dollars in damages"); Barger, 348 F.3d at 1296 ("Omitting the discrimination claims from the schedule of assets appeared to benefit [the Chapter 7 debtor] because, by omitting the claims, she could keep any proceeds for herself and not have them become part of the bankruptcy estate.").

Turning to the specifics of this case, there is substantial evidence of Mr. Brown's motive to conceal his FLSA and FMLA claims from the Bankruptcy Court.  At the time that Mr. Brown hired counsel to pursue this matter in December 2013, his unsecured creditors held claims totaling more than $15,000 but were being paid at a rate that would return *pennies* to them, if anything.  The unpaid claims were scheduled to be extinguished imminently and were so extinguished by the Bankruptcy Court's discharge on March 18, 2014.  Mr. Brown filed his Complaint approximately one month later, and within the next few weeks his

bankruptcy case was closed.

In this same time frame, it is clear that Mr. Brown attached tremendous value to his FLSA and FMLA claims. Mr. Brown testified that for the "produce resets" alone, Defendants owed him "thousands" of dollars in uncompensated overtime, which he knew to be unlawful *at the time* Defendants failed to pay him in 2008, 2009, and 2010. (Pl.'s Dep. at 90-91, 245-46.) Mr. Brown's Complaint, which Ms. Spalding purportedly began to draft in December 2013, requests, *inter alia*, "all damages and remedies allowed under the FMLA, including reinstatement, past and future lost wages, employment benefits, liquidated damages in an amount equal to Plaintiff's lost wages and employment benefits, plus any actual monetary losses sustained by Plaintiff as a direct result of the violation, plus interest, a reasonable attorney's fee, reasonable expert witnesses' fees, and other costs of the action." (Compl., Doc. 1, ¶ 31.) As in Robinson, 595 F.3d at 1276, Mr. Brown "obviously had some expectation of monetary recovery," as he sought compensatory and liquidated damages, all costs, and "all [other] appropriate and allowable damages." (See Compl. at 11-14.) This inference is only confirmed by the $200,000 value assessment Mr. Brown later assigned to this case on his amended schedules, which the Court notes is double the worth he ascribes to the neck and back injuries suffered in the aggravating automobile accident. (Bankr. Doc. 69 at 3.)

Moreover, Mr. Brown simply could not have forgotten about his bankruptcy case in December during his case preparation or in April when he filed suit. As the Court previously mentioned, sometime on or before December 17, 2013, Mr. Brown contacted his bankruptcy counsel to request a payoff amount given his newfound unemployment. (Doc. 31-5.) On December 27, 2013, Mr. Brown completed an instructional course in personal financial management, as required by the Code. (Bankr. Doc. 56.) He filed the mandatory certification with the Bankruptcy Court three days later. (Id.) Thereafter, Mr. Brown received several significant communications from the Bankruptcy Court, including a Release of Wages on January 13, 2014 (Bankr. Docs. 58, 59) and a notice of Completion of Plan Payments on February 3, 2014 (Bankr. Doc. 60). On April 4, 2014, only *days* before he filed the Complaint in this matter, he received the Trustee's Final Report and Account, which reflected on its cover that over $18,000 in claims had been discharged without payment. (Bankr. Doc. 65.) At any of these times, Mr. Brown could and should have notified the Bankruptcy Court, the Chapter 13 Trustee, and his creditors about his potentially valuable claims. The undisputed evidence, however, is that Mr. Brown took no action even though there was a five-month window between the point he retained counsel to initiate the instant prosecution in December 2014 and the final decree closing his bankruptcy case on May 21, 2014. At the very minimum, Mr. Brown had a one-month window to

24

act from the date on which he actually filed the Complaint.

Mr. Brown had knowledge of his claims during the pendency of his Chapter 13 case and a clear motive to conceal them. Having duly considered the particular circumstances of this case, the Court infers that Mr. Brown intended to manipulate the judicial system.

### 3. *Additional Factors*

The Court has focused on the two primary factors guiding the application of judicial estoppel in the Eleventh Circuit: inconsistent positions under oath and intentional manipulation of the judicial system. Here, both are met. Nevertheless, "these two enumerated factors are not inflexible or exhaustive; rather, courts must always give due consideration to all of the circumstances of a particular case." Burnes, 291 F.3d at 1286. The Court now turns to other circumstances in this case which have been found relevant by courts in this circuit.

### a. *Access to Counsel*

The Bankruptcy Court docket reflects that Mr. Brown was represented by counsel for the entire duration of his Chapter 13 case. Cf. Burnes, 291 F.3d at 1284 (noting that the plaintiff whose undisclosed claims were estopped "had a lawyer for the entirety of his bankruptcy proceeding"); Barger, 348 F.3d at 1295 (holding that the plaintiff was barred by judicial estoppel — even though the plaintiff notified her bankruptcy attorney

about her discrimination suit — because she voluntarily chose her attorney and could not "avoid the consequences of the acts or omissions of this freely selected agent").

In addition to his bankruptcy counsel, Mr. Brown retained W. Douglas Adams on December 9, 2012 — two days after suffering injuries in the work-related car accident — to represent him with respect to those interests. (Pl.'s Dep. at 51; Pl.'s Aff. ¶ 11.) By December 19, 2012, Mr. Adams began corresponding with Mr. Brown's health care providers to collect his treatment records. (Docs. 29-3, 29-4.)

Upon his termination, Mr. Brown also retained Ms. Spalding as counsel to pursue his claims under the FLSA and FMLA. (Doc. 29-5.) By December 19, 2013, Mr. Spalding sent Defendants a letter "contend[ing] Mr. Brown was terminated in violation of the Family Medical Leave Act," "ha[d] a claim for unpaid overtime compensation under the Fair Labor Standards Act," and was "currently drafting a Complaint." (Id.) Yet, despite this threefold representation, there is no evidence that Mr. Brown ever informed his bankruptcy counsel about the FLSA and FMLA claims or told Ms. Spalding about his ongoing bankruptcy proceeding despite being in contact with his bankruptcy counsel mere days before Ms. Spalding communicated with Defendants for the first time.[4] These facts strengthen the inference that Mr.

---

[4] In Ajaka, there was "significant evidence" that the plaintiff's attorneys intended to amend the bankruptcy schedules before any defendant invoked judicial estoppel, and that evidence was sufficient to create a

Brown intentionally concealed his claims during the window when both cases were pending.

### b. *Prejudice*

Another factor is whether Mr. Brown successfully misled the court and derived an unfair advantage over an opposing party.[5] See Ajaka, 453 F.3d at 1344 (citing New Hampshire v. Maine, 532 U.S. 742, 751 (2001)). Here, Mr. Brown misled the Bankruptcy Court and gained an unfair advantage over his creditors. In the normal case "[t]he disclosure of post-confirmation assets [in Chapter 13 cases] gives the trustee and creditors a *meaningful* right to request, under [11 U.S.C. § 1329], a modification of the debtor's plan to pay his creditors." Waldron, 536 F.3d at 1245 (emphasis added). Had Mr. Brown disclosed his intent to file the instant lawsuit in December when he retained counsel, which was pre-discharge, his creditors would have had the opportunity to "move the bankruptcy court to modify the plan to increase payments made by the debtor to satisfy a larger percentage of the creditors' claims." Id. By the time Mr. Brown actually *filed* the instant suit, which was post-discharge,

---

genuine issue of material fact as to whether the plaintiff intended to manipulate the judicial system. 453 F.3d at 1346. In contrast, there is no evidence in this case that Mr. Brown or his attorneys ever sought to disclose either his personal injury claim or his FLSA and FMLA claims to the bankruptcy court before Defendants raised the issue of judicial estoppel.

[5] There is no requirement that the party invoking the judicial estoppel show prejudice. Ajaka, 453 F.3d at 1345; see also Burnes, 291 F.3d at 1286 ("[S]ince the doctrine is intended to protect the judicial system, those asserting judicial estoppel need not demonstrate individual prejudice."). Thus, the fact that Defendants have not been prejudiced in this matter does not preclude the application of judicial estoppel in this case.

he foreclosed any such opportunity for his creditors: only *before* the completion of plan payments may the plan be modified. 11 U.S.C. § 1329(a). Simply, Mr. Brown failed to make the requisite disclosures and his creditors were never informed of his potentially valuable discrimination claims prior to the closing of the bankruptcy case.

Therefore, this case is distinguishable from Ajaka, 453 F.3d at 1345-46, which held that judicial estoppel did not bar Truth in Lending Act claims where the plaintiff's bankruptcy creditors received notice of the claims shortly after confirmation and had an opportunity to revoke the Chapter 13 plan. For the same reason, this case is unlike Strauss v. Rent-A-Ctr., Inc., 192 F. App'x 821, 823 (11th Cir. 2006), which held that judicial estoppel did not apply where the plaintiff was not successful in misleading the first tribunal because the bankruptcy court "never entered any order discharging any of [the plaintiff's] debts." See also Thompson v. Quarles, 392 B.R. 517, 527, 529 (S.D. Ga. 2008) (Alaimo, J.) (declining to bar plaintiffs' undisclosed personal injury claims where judicial estoppel argument was raised while the bankruptcy case was ongoing, there was still time to give creditors an opportunity to modify the plan, and the integrity of the bankruptcy proceeding was not seriously impaired). Similarly, Parker v. Wendy's Int'l, Inc., 365 F.3d 1268, 1269-72 (11th Cir. 2004), is distinguishable because the plaintiff notified the bankruptcy court of her

discrimination claims before her employer raised judicial estoppel as a defense, and the Chapter 7 Trustee intervened in the discrimination suit as the real party in interest.[6] Unlike the present case, there was minimal prejudice to bankruptcy creditors in these other cases.

In response to Defendants' warning in January 2015 that they intended to pursue an aggressive judicial estoppel defense, Mr. Brown reopened his bankruptcy proceeding to include the undisclosed claims. (Bankr. Doc. 67.) In Burnes, the Eleventh Circuit found that a motion to reopen under similar circumstances "acknowledge[d], at least implicitly, that disclosing [the lawsuit] would have likely changed the result of his bankruptcy." 291 F.3d at 1288. The inference that Mr. Brown's unsecured creditors could have received a substantial amount more than $176.83 is equally as strong in this case, as his amended schedules reflect a roughly 24,000 percent increase in his assets — from a mere $1,450 to several hundred thousand dollars. Indeed, Mr. Brown's motion to reopen is explicit: he states that he "needs to amend some portions of his petition which could lead to *all* unsecured creditors being *paid in full — 100%*." (Bankr. Doc. 67 ¶ 2 (emphasis added).)

> Allowing [Mr. Brown] to back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider

---

[6]   See also Thompson, 392 B.R. at 528 n.12 (explaining why Parker is inapplicable to Chapter 13 cases).

disclosing potential assets only if he is caught concealing them. This so-called remedy would only diminish the necessary incentive to provide the bankruptcy court with a truthful disclosure of the debtors' assets.

Burnes, 291 F.3d at 1288; see also Barger, 348 F.3d at 1297 ("Finally, Barger's attempt to reopen the bankruptcy estate to include her discrimination claim hardly casts her in the good light she would like. She only sought to reopen the bankruptcy estate after the defendants moved the district court to enter summary judgment against her on judicial estoppel grounds.").

In sum, substantial time passed — approximately nine months between Mr. Brown's initiation of this suit and disclosure — and the receipt of benefit already occurred; Mr. Brown's motion to reopen and subsequent amendments, which transpired only after the prospect of judicial estoppel was raised by Defendants, cannot easily undo his damage.[7] This Court will not incentivize such conduct that places the integrity of the judicial process in jeopardy.

---

[7] At this time, Mr. Brown's creditors cannot move to revoke the discharge as procured through fraud because such a motion must be made within one year of discharge, i.e. before March 18, 2015. 11 U.S.C. § 1328(e). The Bankruptcy Court issued notice to Mr. Brown's creditors of his Motion to Reopen via first class mail on February 6, 2015. (Bankr. Doc. 70.) Mr. Brown's creditors - as well as the Chapter 13 Trustee - therefore, had forty days, at most, to seek revocation through the initiation of an adversary proceeding. See FED. R. BANKR. P. 7001(4).

4.    *Mr. Brown's Rebuttal*

Mr. Brown attempts to rebut the Court's conclusion by (1) submitting an affidavit in which he avers "I had no intention to conceal my claims against Winn Dixie for overtime wages and for interference and retaliation in violation of the [FMLA] from the bankruptcy court;" (2) pointing to one line in his deposition, in which he testified "[t]hat is something I was not even aware of" when asked about his bankruptcy filings and his duty to amend those filings; and (3) arguing that "the relevant inquiry should be whether the legal claims not disclosed to the bankruptcy court was [sic] in existence at the time the debt made affirmative representations to the [c]ourt regarding his assets," not the mere "fail[ing] to come forward years after the bankruptcy was initially filed." (Pl.'s Sur-Reply at 6, 12; Pl.'s Dep. at 349-52; Pl.'s Aff. ¶ 14.)

First, self-serving affidavits are not sufficient to create an issue of fact for trial. Kirkland v. Everglades Corr. Inst., No. 12-22302-CIV, 2014 WL 1333212, at *4 n.6 (S.D. Fla. Mar. 31, 2014); Tidwell-Williams v. Nw. Ga. Health Sys., Inc., No. 1:97-CV-1726A-JEC, 1998 WL 1674745, at *6 (N.D. Ga. Nov. 19, 1998) (citations omitted). Second, other facts in the record tend to contradict Mr. Brown's deposition testimony. Despite not being "aware" of his obligation to amend, Mr. Brown moved four times post-confirmation — in January 2010, December 2010, July 2011, and again in November 2013 — to add creditors to his bankruptcy

plan for unsecured debts that he forgot to include in the original petition. (Bankr. Docs. 37, 42, 46, 52.) Third, courts in this circuit do recognize and carefully consider the "significant" distinction between the failure to disclose an existing claim in an original bankruptcy petition and the untimely disclosure of a *new* claim in an amended filing. See, e.g., Smith v. Werner Enters., Inc., 2014 WL 6977889, at *4 (citing Roots v. Morehouse Sch. of Med., Inc., No. 1:07-cv-00112-JOF, 2009 WL 4798217, at *7 (N.D. Ga. Dec. 8, 2009) and Snowden v. Fred's Stores of Tenn., Inc., 419 F. Supp. 2d 1367, 1373 (M.D. Ala. 2006)). But this distinction is not dispositive standing alone; it is merely one consideration among many to determine whether the inference of intent is appropriate is any given case. What Mr. Brown advances the law *should* be is simply not what the law is: debtors' duty to disclose is a "continuing one that does not end once the forms are submitted to the bankruptcy court; rather, a debtor must amend his financial statements if circumstances change," even if that means "com[ing] forward years after the bankruptcy was initially filed." Burnes, 291 F.3d at 1286.

In the absence of any other evidence proffered by Mr. Brown and in light of the Court's exhaustive consideration of other relevant circumstances, including that this case is not one of affirmative misrepresentation, the Court still finds Mr. Brown has failed to show that the inference of intent is not warranted

in this case.

**B.    Application of Judicial Estoppel to Mr. Brown's Claim for Reinstatement**

In Burnes, the court decided that while judicial estoppel barred the plaintiff from pursuing claims for monetary damages, the doctrine did not prohibit him from pursuing claims which add no monetary value to the bankruptcy estate.   291 F.3d at 1289. Following this rule, the court allowed the plaintiff to proceed on his request for reinstatement in Barger.   348 F.3d at 1297. Therefore, like the plaintiffs in Burnes and Barger, judicial estoppel does not prohibit Mr. Brown from pursuing any claims for injunctive relief that he may have.    To the extent Defendants seek to estop Mr. Brown from asserting these claims on account of nondisclosure, their motion for summary judgment is **DENIED.**

**C.    Defendants' Request for Attorney's Fees & Costs**

Defendants request "all of their attorney's fees and costs in litigating the present action," emphasizing they sent Mr. Brown's counsel "a detailed letter, citing case law, regarding Plaintiff's bankruptcy and the application of judicial estoppel."    (Defs.' Br. at 19.)    They assert that Mr. Brown's counsel "ignored" their letter and "simply reopened Plaintiff's bankruptcy and has continued to litigate Plaintiff's claims." (Id.)

The Court **DENIES** Defendants' request, as judicial estoppel does not prohibit Mr. Brown from pursuing equitable relief, including reinstatement, under either the FLSA or the FMLA. See 29 U.S.C. § 216(b); 29 U.S.C. § 2617(a)(1)(B). Moreover, Defendants did not present any authority in support of a fee award, and their sole factual allegation appears to be that Ms. Spalding failed to offer "argument, explanation, or case law to rebut Defendants' position" as outlined in Defendants' January 23, 2015 courtesy memorandum. (See Defs.' Br. at 19.) The Court is unaware of any duty that would require Ms. Spalding to do so. In any case, once Defendants filed this motion, Ms. Spalding submitted two twenty-page briefs on behalf of her client in a rigorous effort to rebut the application of judicial estoppel, both of which incorporated extensive citation to Eleventh Circuit precedent, including one decision with facts identical to this case that has not been expressly overruled.[8] See generally Muse, 129 F. App'x 487. For these reasons also, the Court cannot find that Defendants are entitled to fees and costs.

---

[8]     As the Honorable Anthony A. Alaimo observed, "the application of judicial estoppel in non-bankruptcy courts to bar debtors' causes of action against purported tortfeasors[, among others,] could be described as a doctrine run amok." Thompson v. Quarles, 392 B.R. 517, 525 (S.D. Ga. 2008). "Disagreement among jurists and discord in case outcomes has been caused by a motley assortment of suspicious behavior by suspected dissembling debtors; a group of technical, inscrutable, overlapping, and inconsistent bankruptcy statutes; an ignorance of bankruptcy procedures and practicalities by non-bankruptcy courts and practitioners; confusion over which law applies, state or federal; and an endless variance in the circumstances of individual cases." Id. at 526.

## III. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Defendants Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC's Motion for Summary Judgment on judicial estoppel grounds. (Doc. 27.) The Court **DENIES** Defendants' request for attorney's fees and costs, as well as their Motion for Oral Argument. (<u>Id.</u> at 19; Doc. 35.) Plaintiff Isaiah Brown's equitable claim for reinstatement **SHALL** proceed.

**ORDER ENTERED** at Augusta, Georgia, this _20th_ day of May, 2015.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA